IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

UNITED STATES OF AMERICA                           PLAINTIFF/RESPONDENT

V.                    Case No. 3:13-cr-30012-TLB-MEF-2

NICHOLAS KRUG                                       DEFENDANT/PETITIONER

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is the Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody filed April 28, 2017. (ECF No. 131). The United States filed its response on May 31, 2017. (ECF No. 134). Petitioner filed a reply on June 30, 2017. (ECF No. 137). The matter is ready for Report and Recommendation.

### I. Background

On October 30, 2013, Defendant/Petitioner, Nicholas Krug ("Krug"), was named in an Indictment charging him with knowingly and willfully devising a scheme to defraud persons by means of materially false and fraudulent pretenses, representations, and promises, and with one count of wire fraud, all in violation of 18 U.S.C. § 1343. (ECF No. 1). A Summons was issued directing Krug to appear on November 12, 2013, and Krug appeared before the Hon. James R. Marschewski, U. S. Magistrate Judge, for arraignment on that date at which time Krug entered a not guilty plea to the Indictment. (ECF No. 16). Phillip A. Moon ("Moon"), a Criminal Justice Act panel attorney, was appointed to represent Krug. (ECF No's. 16, 23). Krug was released on bond. (ECF No's. 16, 19).

A Superseding Indictment was filed on December 11, 2013, charging Krug with knowingly and willfully devising a scheme to defraud persons by means of materially false and fraudulent

-1-

pretenses, representations, and promises, and with one count of conspiracy to commit wire fraud, all in violation of 18 U.S.C. § 1349. (ECF No. 27). Krug was arraigned on the Superseding Indictment on December 18, 2013, and Krug entered a plea of not guilty to the Supreseding Indictment. (ECF No. 34). The Government responded to Moon's request for discovery on December 18, 2013. (ECF No. 35).

Krug and his Co-Defendant, Charles Edward Elliott ("Elliott"), jointly filed a motion to change venue on March 10, 2014. (ECF No. 41). That motion was denied on March 17, 2014. (ECF No. 43). A second joint motion for change of venue was filed on September 18, 2014. (ECF No. 58). It was denied on September 25, 2014. (ECF No. 62).

On April 10, 2014, Krug sent the Court a letter in which he expressed a desire to represent himself. (ECF No. 123, p. 3). The Hon. P. K. Holmes, III, Chief U. S. District Judge, scheduled a hearing on April 14, 2014 to consider Krug's continued representation by appointed counsel. (ECF No. 44). At the hearing, Krug engaged in conduct commonly associated with "sovereign citizens," for example, when asked to come forward into the well of the Court, Krug responded, "Sir, are you inviting me aboard?" (ECF No. 123, p. 3). When ordered to come forward, Krug stated: "Sir, I am a live, living human being. I'm here as a third-party intervenor for the court for the entity of Nicholas Krug, if that's who you are referring to." (ECF No. 123, pp. 3-4). The Court then asked questions to make sure Krug understood the consequences of representing himself. When asked his full name, Krug asked, "[a]re you speaking to Nicholas Krug, the live, living human being or are you speaking to the corporation that's listed on the documents?" (ECF No. 123, p. 7). He then stated, "I am the live, living human being, and I will answer that my name is ... Nicholas Joseph Krug." (ECF No. 123, p. 8). The Court cautioned Krug that there are consequences of self-representation,

-2-

that one must follow the rules of the Court, and that the right of self-representation can be forfeited. (ECF No. 123, pp. 9-10).  When asked if he understood that, Krug responded: "Sir, again, I'm here as a third-party intervenor for that corporate entity that you have that you're trying to get me to agree that I am.  I am the owner of that name.  I am not the entity that you're referring to."  (ECF No. 123, p. 10).  Krug maintained this position when asked if he wished to represent himself, prompting Judge Holmes to rule: "I tell you what, Mr. Krug, you are engaging in what's called - - the Court construes as obstructionist behavior, therefore, you have forfeited your right to represent yourself in this proceeding, and so you're going to be represented by Mr. Moon in this proceeding.  So your request to proceed *pro se* is going to be denied and you're going to be represented by Mr. Moon in the proceeding."  (ECF No. 123, pp. 11-12).

The Court also addressed the Government's motion to compel production of documents (ECF No. 46) at the hearing on April 14, 2014, stating: ". . . the United States learned that the Defendant Nicholas Krug has possession of documents related to the case.  Through no fault of the defense attorney, the defendants refused to produce the documents that they intend to use at trial. . . . so I am going to grant the government's motion to compel the production of documents and order that [Defendants] produce the documents that they intend to use in the defense of their case at the trial that the Court intends to conduct."  (ECF No. 123, p. 13).

On September 26, 2014, just ten days before the date scheduled for jury trial, Krug filed a motion to proceed *pro se* with stand-by counsel.  (ECF No. 63).  Referring to Judge Holmes' April 14, 2014 ruling denying Krug leave to proceed *pro se*, the Hon. Timothy L. Brooks[1], U. S. District Judge, commented that "the ensuing months have only confirmed the wisdom of Judge Holmes'

---

[1] The case was reassigned from Chief Judge Holmes to Judge Brooks on August 8, 2014.

decision as Defendant has continued to mail irrelevant, nonsensical documents to the Court . . ." (ECF No. 64, p. 2).  Finding that Krug was continuing to engage in obstructionist behavior, the Court again denied leave for Krug to represent himself.  (ECF No. 64).

Jury trial was held on October 6-7, 2014.  The Government presented testimony from the following witnesses at trial: Theodore "Ted" Holder, a senior staff attorney at the Arkansas Securities Department, who investigated Krug's activities and referred the matter to the Federal Bureau of Investigation ("FBI") for further investigation (ECF No. 117, pp. 125-54); Ruthann Currence, the victim of Krug's scheme to defraud (ECF No. 117, pp. 156-259; ECF No. 118, pp. 9-62); Robert Cessario, an FBI Special Agent, who investigated the case (ECF No. 118, pp. 63-85); Sally Ballou, a regional service manager for Wells Fargo Bank (ECF No. 118, pp. 86-93); Terry Hendrix, a vice-president, security specialist, and records custodian for Arvest Bank (ECF No. 118, pp. 94-98); Edward Fillmore, a market manager and records custodian for Bank of America in the State of Arkansas (ECF No. 118, pp. 99-107); and, Steven Williams, a forensic accountant with the FBI (ECF No. 118, pp. 108-135).

The Government introduced several exhibits at trial, including correspondence from Sovereign International[2], the Joint Venture Agreement between Sovereign International and Currence, bank routing instructions, CD's of recorded phone calls, e-mails, checks and other bank records.  (ECF No. 70).

After the Government rested, Krug's counsel moved for a judgment of acquittal, which motion was denied by the Court.  (ECF No. 118, pp. 137-38).  The defense then rested without

---

[2] Sovereign International is an entity Krug and Elliott operated to conduct their activities. (ECF No. 118, p. 335).

calling any witnesses.  (ECF No. 118, p. 140).  On October 7, 2014, the jury returned its verdict finding Krug guilty of conspiracy to commit wire fraud as charged in the Superseding Indictment. (ECF No's. 75, 77).

An initial Presentence Investigation Report ("PSR") was prepared by the United States Probation Office on December 4, 2014.  (ECF No. 80).  On December 22, 2014, the Government advised that it had no objections to the initial PSR.  (ECF No. 82).  On December 22, 2014, Krug advised that he had eight objections to the initial PSR.  (ECF No. 86-1).  Of those objections that affected the Sentencing Guidelines calculation, Krug objected to: the four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(19)(A) for representing himself to be an "investment advisor"; the two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C) for use of "sophisticated means" in the commission of the offense; and, the denial of a reduction for acceptance of responsibility.  (Id.). Finding that the enhancements and denial of acceptance of responsibility were correct, no changes to the PSR were made by the Probation Officer in response to Krug's objections.  (Id.).

On January 7, 2015, a final PSR was submitted to the Court.[3]  (ECF No. 86).  The final PSR reported that Krug's conduct called for a base offense level of seven.  (ECF No. 92, ¶ 41).  Finding that the loss was more than $400,000 but less than $1,000,000, the offense level was increased by 14 levels.  (ECF No. 92, ¶ 42).  A two-level increase was assessed because the offense involved sophisticated means.  (ECF No. 92, ¶ 43).  Finally, a four-level increase was assessed because the offense involved a violation of securities law and Krug represented himself to be an investment

---

[3] An amended final PSR containing a Second Addendum was filed on January 21, 2015. (ECF No. 92).  It noted paragraph 34 had been revised to include Ruthann Currence's Victim Impact statement which was received following the disclosure of the final PSR on January 7, 2015.  (ECF No. 92-1).

advisor.  (ECF No. 92, ¶ 44).  Due to these enhancements, Krug's adjusted offense level was 27.

(ECF No. 92, ¶ 48).  No reduction for acceptance of responsibility was made, so Krug's total offense

level was 27.  (ECF No. 92, ¶¶ 49-50).

Krug's lack of criminal history resulted in a criminal history score of zero, placing him in

criminal history Category I.  (ECF No. 92, ¶¶ 53-56).  The statutory maximum term of imprisonment

for Krug's offense is 20 years.  (ECF No. 92, ¶ 92).  Based upon a total offense level of 27 and

criminal history Category I, Krug's advisory Guidelines range was determined to be 70 to 87 months

imprisonment.  (Id.).

Krug appeared for sentencing on January 29, 2015.  (ECF No. 96).  Upon inquiry by the

Court, Krug stated, "I don't understand how this Court can move forward when I have filed

documents challenging jurisdiction," and he expressed not understanding the purpose of the

sentencing proceedings.[4]  The Court then informed Krug of the nature of the proceeding, and Krug

was given an opportunity to confer further with his counsel concerning the final PSR.  (ECF No. 119,

pp. 2, 6).  The Court summarized Krug's objections to the PSR (ECF No. 119, pp. 11-12), and

argument was presented by counsel.   The Court sustained Krug's PSR objections to the

enhancements for use of sophisticated means and commission of the offense by an investment

advisor (ECF No. 119, p. 14), but Krug's objection to not receiving a reduction for acceptance of

---

[4] On January 26, 2015 Krug filed a *pro se* pleading entitled "(Alleged) Defendant Nicholas Krug's Motion for an Order Annulling the Instant Superseding Indictment and the Jury's 'Verdict Form - Nicholas Krug' (Dkt. #77), for the Congress, Government, and Court's Lack of Constitutional Authority to Exercise In Personam Legislative Power or Jurisdiction Over One Who is a Resident of and Domiciled in a Geographical Area Situate Without All Territory and Other Property Belonging to the United States, Such as Krug; Memorandum and Affidavit in Support."  (ECF No. 94).  The Court ordered this pleading stricken by Text Only Order entered on January 27, 2015.

responsibility was overruled (ECF No. 119, pp. 19-22). These rulings resulted in a reduction of six levels (ECF No. 119, p. 14), placing Krug at a total offense level of 21 (ECF No. 119, p. 23). The Court determined Krug's advisory Guidelines range was 37-46 months imprisonment. (ECF No. 119, p. 24).

During his allocution, Krug stated "[w]e did invest those funds with three different entities, and those three different entities stole all this money," that "I had never had any intentions of defrauding anybody out of anything," that "I'm not a [thief] like this Court has made out to be," and that: "I did not commit fraud. We did not defraud the Currences out of their money. Other people took their money." (ECF No. 119, pp. 36-39). Judge Brooks noted that a jury of 12 people found Krug guilty, and that "you've not done yourself any favors by standing up here and telling me that you didn't do anything wrong ..." (ECF No. 119, pp. 39-40). Finding that a sentence in the middle of the Guidelines was appropriate, the Court sentenced Krug to 42 months imprisonment, to be followed by three years supervised release, no fine, restitution in the amount of $539,000[5], and imposition of a $100.00 special assessment. (ECF No. 96, p. 1; ECF No. 119, pp. 43-47). Krug was allowed to remain on bond and self-surrender no later than 1:00 p.m. on Friday, February 20, 2015. (ECF No. 96, p. 2; ECF No. 119, p. 53). Judgment was entered by the Court on February 2, 2015. (ECF No. 102).

Krug timely filed an appeal to the Eighth Circuit Court of Appeals on February 12, 2015. (ECF No. 107). An arrest warrant was issued when Krug failed to surrender to the Federal Bureau of Prisons as ordered (ECF No. 112), and Krug was taken into custody on February 21, 2015 (ECF No. 114).

---

[5] Owed jointly and severally with Elliott.

-7-

On appeal, Krug argued there was insufficient evidence for the jury to conclude that he intentionally participated in a conspiracy to commit wire fraud, and that the District Court erred in denying his motion to proceed pro se and represent himself at trial.  (ECF No. 125-1, p. 2).  The Eighth Circuit Court of Appeals affirmed Krug's conviction and sentence in an Opinion filed on May 4, 2016.  (ECF No. 125-1).  A Mandate was issued on May 31, 2016.  (ECF No. 125).

On April 28, 2017, Krug filed his *pro se* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.  (ECF No. 131).  The motion raises two grounds for relief: (1) "Defective appointment of counsel," and (2) "Access to Evidence."  (ECF No. 131, pp. 4-5).  Attached to Krug's § 2255 motion is a "Motion for Remand to Consider Motion Under Fed Rule Crim. P. 33(B)(1)" in which he asserts newly discovered evidence and further argues his grounds for habeas relief.  (ECF No. 133-1).

The United States' response in opposition to the motion was filed on May 31, 2017.  (ECF No. 134).  On June 5, 2017, Krug filed a "Notice of Motion and Motion to Declare the Grand Jury Unconstitutional and for an Order Dismissing the Indictment and, in the Alternative, for an Order Granting a Post-Indictment Preliminary Hearing - Federal" (ECF No. 135), along with a Memorandum of Law in Support (ECF No. 136).  Krug filed a reply to the Government's response on June 30, 2017.  (ECF No. 137).

## II.  Discussion

"A prisoner in custody under sentence . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which

imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).  "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).  A thorough review of Krug's motion, and the files and records of this case, conclusively shows that Krug is not entitled to relief, and the undersigned recommends the denial and dismissal of Krug's § 2255 motion with prejudice without an evidentiary hearing.

## A.  Krug's Rule 33 Motion

The attachment to Krug's § 2255 motion (ECF No. 131-1) purports to be a motion for new trial made under Fed. R. Cr. P. 33 based on newly discovered evidence, but it also contains argument in support of his § 2255 motion.  To the extent Krug's Rule 33 motion is based on "newly discovered evidence," it fails because the evidence referred to was clearly known and available to Krug prior to trial.  Krug even states, "[a]ll documents, A through H, are all documents that Krug took to court-appointed Attorney Phillip Moon's office and Moon's secretary copied and gave them to Moon." (ECF No. 131-1, p. 19).  Krug faults Moon for not presenting these documents at trial, but that is a different issue and will be addressed below.  Considering the documents in the context of Krug's Rule 33 motion for a new trial, it is undisputed that the documents were in Krug's possession prior to trial; he knew about them and took them to his attorney; so, these documents are clearly not "newly discovered evidence." *See United States v. Vazquez-Garcia*, 340 F.3d 632, 641 (8th Cir. 2003) (motion for new trial on the ground of newly discovered evidence cannot be granted on the

basis of evidence that the defendant was aware of before trial).

Accordingly, Krug's Rule 33 motion, if considered separately from his § 2255 motion, should be denied.

### B.  Issues Raised on Direct Appeal Cannot be Re-Litigated

Krug raised two issues in his direct appeal to the Eighth Circuit Court of Appeals: (1) insufficiency of the evidence to support his conviction, and (2) denial of his request to represent himself.  Those issues were decided adversely to Krug by the Eighth Circuit.  *United States v. Krug*, 822 F.3d 994 (8th Cir. 2016).  (ECF No. 125).  Krug raises the same issues again in the attachment to his § 2255 motion when he claims there was no proof of a conspiratorial agreement and that he was erroneously denied the right to represent himself.  (ECF No. 131-1, p. 22).  Claims that were raised and decided adversely to a criminal defendant on direct appeal cannot be re-litigated on a motion to vacate pursuant to 28 U.S.C. § 2255.  *United States v. Lee*, 715 F.3d 215, 224 (8th Cir. 2013) (internal citations omitted); *see also Sun Bear v. United States*, 644 F.3d 700, 702 (8th Cir. 2011) (citing *Davis v. United States*, 417 U.S. 333, 346-47 (1974)).

These two claims are subject to summary dismissal in this proceeding.

### C.  Non-Ineffective Assistance of Counsel Claims Are Procedurally Defaulted

Krug raises two vaguely stated grounds for relief in his § 2255 motion: (1) "defective appointment of counsel," citing *United States v. Cronic*, 466 U.S. 648 (1984), and (2) "access to evidence," citing *Arizona v. Youngblood*, 488 U.S. 51 (1988).  (ECF No. 131, pp. 4-5).  The attachment to Krug's § 2255 motion also raises two other non-ineffective assistance of counsel claims: the Indictment may have been procured by fraud, and Krug was denied the right to be tried by a jury of his peers. (ECF No. 131-1, pp. 21, 22).  Krug's non-ineffective assistance of counsel

claims are procedurally barred because they were not raised in Krug's direct appeal.

The United States Supreme Court has "long and consistently affirmed that a collateral challenge may not do service for an appeal." *United States v. Frady*, 456 U.S. 152, 165 (1982) (internal citations omitted).  Relief under § 2255 "is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice." *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996).

The failure to raise an issue on direct appeal ordinarily constitutes a procedural default and precludes a defendant's ability to raise that issue for the first time in a § 2255 motion.  *Dejan v. United States*, 208 F.3d 682, 685 (8th Cir. 2000) (citing *Bousley v. United States*, 523 U.S. 614, 621 (1998)).  "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice' or that he is 'actually innocent.'" *Bousley*, 523 U.S. at 622.  "For cause to exist, the external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  Krug makes no such showing here.  He does not demonstrate how the factual basis for his claims was not reasonably available to him in time to pursue relief on direct appeal.

Krug argues "defective appointment of counsel," citing *Cronic* for the proposition that "there could be situations in which the appointment of counsel was so deficient as to be treated as an automatic violation of the Sixth Amendment." (ECF No. 131-1, p. 4).  Krug also vaguely alleges a violation of the prosecution's duty to disclose evidence, including exculpatory material, citing

-11-

*Youngblood*. (ECF No. 131-1, p. 5). Krug fails, however, to allege any specific facts in support of these claims and, critical to the analysis of "cause" to excuse his procedural default, he does not explain how the facts underlying these claims were not available to him in time to raise the issues in this Court and on direct appeal. He states no facts that would place his case within the scope of *Cronic's* presumption of ineffectiveness, and he alleges no facts to support his claim that the Government failed to produce exculpatory evidence. Vague and conclusory allegations, unsupported by any specifics, are subject to summary dismissal. *See Hollis v. United States*, 796 F.2d 1043, 1046 (8th Cir. 1986); *Smith v. United States*, 677 F.2d 39, 41 (8th Cir. 1982).

Krug had twice sought, and been denied, leave of the Court to represent himself, so he was well familiar with the Court's appointment of attorney Moon and the actions taken by Moon to prepare for and represent Krug during the two day jury trial. Having been present at trial, Krug also saw the evidence presented by the Government at trial. He had knowledge, therefore, of the factual basis for his claims of "defective appointment of counsel" and "access to evidence" in time to pursue relief on direct appeal.

The facts underlying Krug's two other non-ineffective assistance of counsel claims – that the Indictment was procured through fraud and that Krug was denied a jury of his peers – were also available to Krug in time to appeal.

First, Krug argues that his case is based on fraud if an affidavit of the victim, Ruthann Currence ("Mrs. Currence"), was used to obtain the indictment against him. This is so, according to Krug, because the affidavit was actually prepared by Theodore "Ted" Holder ("Mr. Holder"), a senior staff attorney with the Arkansas Securities Department, and "then signed by Ruthann Currence knowing that Ted made the affidavit out, in his words, to suit himself and inserted at least one

sentence on his own that he admits that 'it is not on the tape.'" (ECF No. 131-1, p. 21).  This does not constitute "cause" to overcome the procedural default because the factual basis for the claim could have been developed at the time of trial.  Both Mr. Holder and Mrs. Currence testified at trial, and the issue could have been addressed at that time and on appeal.

Next, Krug claims he was denied the right to a jury of his peers.  He states that the prosecutor and main witness are women, and that the jury was comprised of 11 women and one man.  He further asserts that one of the women jurors, who became the foreperson of the jury, was "disqualified because she had lost money in an investment." (ECF No. 131-1, p. 22).  These facts, quite obviously, were known to Krug at the time of trial, and he could have raised his claim then and on appeal.

Krug does not assert that some interference by government officials, or some external impediment, prevented him from raising any of these claims in the trial court or on direct appeal.

The non-ineffective assistance of counsel claims Krug now asserts as grounds for § 2255 relief were simply not raised on direct appeal, and Krug is barred from raising those issues for the first time in this § 2255 proceeding.

Since Krug has not shown adequate cause to overcome the procedural bar in his case, the Court need not consider the issue of actual prejudice.  *Ashker v. Class*, 152 F.3d 863, 871 (8th Cir. 1998) (citing *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982)).

Krug also fails to demonstrate actual innocence to overcome the procedural bar.  As discussed in greater detail below regarding the documents Krug faults his counsel for not introducing at trial, Krug has presented no new, reliable evidence to support his claim of actual innocence.  "Without any new evidence of innocence, even the existence of a concededly meritorious

-13-

constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup v. Delo*, 513 U.S. 298, 316 (1995).

Krug has not shown "cause and prejudice" or a "miscarriage of justice" to overcome his procedural default of the non-ineffective assistance of counsel claims he now asserts, and these claims should be summarily dismissed.

### D.  The Non-Ineffective Assistance of Counsel Claims Are Baseless

Even if the Court were to consider Krug's procedurally defaulted claims, they have no merit.

### 1.  No Presumptive Violation of Sixth Amendment Rights

Krug cites *United States v. Cronic* in support of his "defective appointment of counsel" claim.  (ECF No. 131, p. 4).

A violation of an accused's Sixth Amendment right to counsel normally requires a showing of ineffective assistance of counsel under the *Strickland v. Washington* standard.  In *Cronic*, the Supreme Court held that courts may forego the *Strickland* analysis when the circumstances "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658.  Those circumstances include: (1) "the complete denial of counsel"; (2) where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing"; and, (3) where "the surrounding circumstances made it so unlikely that any lawyer could provide effective assistance." *Id.* at 658-61.

While stating "there could be situations in which the appointment of counsel was so deficient as to be treated as an automatic violation of the Sixth Amendment" (ECF No. 131, p. 4), Krug alleges no supporting facts to demonstrate how his case falls within the scope of *Cronic*.  Conclusory allegations, unsupported by any specific facts, are subject to summary dismissal. *See Hollis*, 796

F.2d at 1046; *Smith*, 677 F.2d at 41.  Accordingly, Krug's claim of "defective appointment of counsel" should be summarily dismissed.

## 2.  No Violation of "Access to Evidence"

Krug next asserts a violation of his right to "access to evidence," citing *Arizona v. Youngblood*.  (ECF No. 131, p. 5).

*Youngblood* concerned a claim that police failed to preserve evidence that was potentially useful to the defense.  Noting that the Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady v. Maryland*, 373 U.S. 83 (1963), makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material *exculpatory* evidence, the Supreme Court in *Youngblood* held that unless a criminal defendant can show bad faith on the part of the police, failure to preserve only *potentially useful* evidence does not constitute a denial of due process of law.  488 U.S. at 57-58.

Krug refers to "what might loosely be called the area of constitutionally guaranteed access to evidence" (ECF No. 131, p. 5), but again, he fails to allege any facts that would show a violation of his constitutional rights.  He does not identify any exculpatory evidence that was supposedly not disclosed by the Government, nor does he describe any potentially useful evidence that the Government supposedly destroyed.  Krug's claim of a violation of his "access to evidence" is entirely conclusory and should be summarily dismissed.

## 3.  No Showing That Indictment Was Procured by Fraud

In the attachment to his § 2255 motion, Krug alleges that an affidavit of Mrs. Currence "may have been used to obtain the indictment against me," and if so, "my case is based on fraud."  (ECF No. 131-1, p. 21).  Krug argues that Mr. Holder "made the affidavit out, in his words, to suit himself

and inserted at least one sentence on his own that he admits that 'it is not on the tape.'" (Id.). He also alleges that Mr. Holder testified at trial that Sovereign International did not break any laws in Arkansas. (Id.). Krug's allegations are contrary to the record, and there is no showing that the Indictment or Superseding Indictment were procured by fraud.

Krug's claim amounts to one of perjured testimony. In order to prevail on such a claim in a § 2255 proceeding, two elements must be established: first, the use of perjured testimony, and second, knowledge by the prosecuting officials, at the time the testimony was used, that it was perjured. *Taylor v. United States*, 229 F.2d 826, 832 (8th Cir. 1956), *cert. denied*, 351 U.S. 986 (1956). The burden of establishing the existence of those two elements is upon the petitioner. *Id*. Krug fails to carry that burden.

Krug appears to base his claim upon an e-mail sent by Mr. Holder to Mrs. Currence on January 28, 2011. The e-mail refers to the latest draft of an affidavit, and it reflects that Mr. Holder received faxes from Mrs. Currence who provided input for the affidavit. The e-mail, in relevant part, states:

> "I inserted a sentence in paragraph that Elliott was enthusiastic about the trader who would be investing the money raised. As you can see, this statement purports to be made in the telephone conversation you have taped. However, it is not on the tape. It occurs to me that the statement was made in that conversation, but before the tape recorder was turned on. Is that correct?" (ECF No. 131-1, p. 170).

In a handwritten note on the e-mail, Mrs. Currence wrote "yes" in response to that question, and she circled "we agree" confirming that the affidavit was true and correct to the best of her recollection. (Id.). There is, therefore, nothing in the record to support a conclusion that Mr. Holder used false or perjured information in preparing Mrs. Currence's affidavit.

Krug also misrepresents Mr. Holder's testimony concerning whether Sovereign International broke any laws in Arkansas.  Mr. Holder did not testify that Krug broke no Arkansas laws, but rather, that Krug *told him* that he did not believe he had violated any law.  (ECF No. 117, p. 150).  Krug's self-serving belief was not actually based upon Arkansas law, but on Black's Law Dictionary.  (ECF No. 117, p. 151).

Krug's claim that the Indictment was procured by fraud has no support in the record and should be summarily dismissed.

### 4. No Violation of Krug's Right to an Impartial Jury

Krug also argues he was "denied my right to be tried by a jury of my peers without bias." (ECF No. 131-1, p. 22).  Krug points out that he and Elliott are men, that the prosecutor and main witness are women, and "the court sat a jury of eleven women and one man."  (Id.).  He further alleges "[o]ne of the women on the jury is one that was disqualified because she had lost money in an investment and she was the foreman of the jury."  (Id.).  The claim has no merit.

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross-section of the community."  *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (citing *Taylor v. Louisiana*, 419 U.S. 522 (1975)).  To establish a prima facie violation of the fair-cross-section requirement, a criminal defendant must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process."  *Id*. (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).  The Court cautioned, however, that "[t]he fair-cross-section principal must have much

leeway in application." *Id.*, 559 U.S. at 321 (citing *Taylor*, 419 U.S. at 537-38).

Krug essentially complains that there were not enough men on his jury.  The Supreme Court has explicitly rejected the proposition that a criminal defendant is "entitled to a jury of any particular composition" so long as "the jury wheels, pools of names, panels, or venires from which the juries are drawn [do] not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538.

Krug fails to make a prima facie showing that men are not fairly and reasonably represented in juries and that their underrepresentation is due to some systematic exclusion.  He alleges no specific facts to demonstrate that men are systematically excluded in the jury selection process.  As such, his claim has no merit.

Krug also claims one of the women on the jury, who became the Foreperson of the jury, "was disqualified because she had lost money in an investment." (ECF No. 131-1, p. 22).  Impartiality of a juror is presumed "so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *United States v. Evans*, 272 F.3d 1069, 1078 (8th Cir. 2001) (quoting *Lockhart v. McCree*, 476 U.S. 162, 184 (1986), *cert. denied*, 535 U.S. 1029 (2002)).  The mere existence of a preconceived notion as to the guilt or innocence of an accused, without more, is insufficient to rebut the presumption of a prospective juror's impartiality. *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

During voir dire, several prospective jurors responded affirmatively to an inquiry if anyone had lost money on an investment.  Each of them were then asked if that experience would affect their ability to listen just to the evidence and reach a verdict only by that evidence and not by what had

happened to them. One prospective juror (Juror 20) responded that she was 85 to 90 per cent sure she would not be influenced by what happened to her. (ECF No. 117, p. 74). Juror 20 was excused for cause by the Court. (ECF No. 117, p. 84). All of the other prospective jurors responded that their experience of having lost money on an investment would not affect their ability to listen to the evidence and render a verdict based only on the evidence. (ECF No. 117, pp. 72-76). At the conclusion of voir dire, Krug's counsel did not voice objections to any of the prospective jurors, did not move to strike any of them for cause, and he announced that the selected jurors were acceptable. (ECF No. 117, pp. 84, 94-95). Accordingly, Krug has failed to overcome the presumption of impartiality of the chosen jurors, and his claim necessarily fails.

### E. Trial Counsel's Performance Was Not Constitutionally Deficient

#### 1. Legal Standard for Ineffective Assistance of Counsel Claims

To prove a claim of ineffective assistance of counsel, a criminal defendant must demonstrate both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the deficient performance prong of the *Strickland* test, one must show that counsel's representation fell below the "range of competence demanded of attorneys in criminal cases." *Id*. at 688. Review of counsel's performance is highly deferential, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. at 689. Moreover, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 690). Courts also "do not use hindsight to question counsel's performance," but instead must analyze it according to counsel's situation at the time of the allegedly incompetent act or omission.

*Kenley v. Armontrout*, 937 F.2d 1298, 1303 (8th Cir. 1991).  If one fails to establish deficient performance by counsel, the court need proceed no further in its analysis of an ineffective assistance of counsel claim.  *United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003).

To establish the prejudice prong of the *Strickland* test, one must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  The United States Supreme Court has clarified that the proper prejudice analysis is whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687).

### 2.  Failure to Introduce Documentary Evidence

Krug's first claim of ineffective assistance of counsel is that Moon "committed a 'legal wrong' and was constitutionally inadequate when he ignored his ethical obligation to turn over any evidence to the court tending to negate guilt or mitigating the offense under ABA model rules of professional conduct 3.8(d) and it[s] state counterparts."  (ECF No. 131-1, p. 19).  Krug's reliance on Rule 3.8 is misplaced, and his claim otherwise lacks merit.

The Model Rules of Professional Conduct promulgated by the American Bar Association serve as the model for ethics rules for most states, including Arkansas.  As the Government correctly points out, Rule 3.8 of the ABA Model Rules of Professional Conduct[6] relates to the special responsibilities of a prosecutor and has no application to defense counsel.

Krug faults Moon for "suppressing" various documents "that testify to the facts."  (ECF No. 131-1, p. 22).  Krug has appended those documents (Exhibits A through F) to the attachment to his

---

[6] And its Arkansas counterpart, Rule 3.8 of the Arkansas Rules of Professional Conduct.

§ 2255 motion, and he asserts they support "the fact that there was no attempt to defraud anyone." (ECF No. 131-1, p. 19).  The argument does not hold up under scrutiny.

One of the exhibits Krug identifies was received in evidence.  Krug's Exhibit A (ECF No. 131-1, pp. 74-78), the March 30, 2007 Joint Venture Agreement between Sovereign International, LLC and Ruthann Currence, was offered and received in evidence as Government Exhibit 3.  (ECF No. 117, pp. 203-204).  Accordingly, there is no basis to claim that this document would have aided in Krug's defense.  To the contrary, the Joint Venture Agreement furthered the Government's case by showing there was no disclosure regarding the possibility of losing principal value[7], no disclosure regarding use of the principal to pay third-party commissions and Defendants' expenses, and no disclosure regarding what, if anything, the principal was being invested in.

Krug's belief that Exhibit B (ECF No. 131-1, pp. 79-103) would have aided in his defense is similarly misplaced.  The first page of Exhibit B is a Funds Transfer Request and Authorization form that shows a wire transfer from Krug (on behalf of Sovereign International, LLC) to Primary Investments R & H, LLC in the amount of $300,000.00 on March 29, 2007.  (ECF No. 131-1, p. 80). Notably, this document reveals, first, that immediately prior to the receipt of Mrs. Currence's $500,000.00 the Sovereign International, LLC checking account had a balance of only $201.26[8], and second, that only $300,000.00 of Mrs. Currence's money was "invested."  Mrs. Currence was led to believe that her entire $500,000.00 would be invested (ECF No. 117, p. 184), and Exhibit B would

---

[7] The Joint Venture Agreement only provided for the possibility that a profit might not be realized (¶ 7(C)), not that the principal value may be lost.  (ECF No. 131-1, p. 76).

[8] Steven Williams, an FBI forensic accountant, testified that the balance in the Sovereign International account at the time of Mrs. Currence's $500,000 wire transfer was only $211.38. (ECF No. 118, p. 114).

have revealed otherwise.  Exhibit B would have raised questions as to where the other $200,000.00 went, and it would have further supported the testimony of FBI Special Agent Robert Cessario ("SA Cessario") that upon his review of Sovereign International's bank records he "saw a large amount of money going to an LLC called Krug International that [Krug] owned and ... credit card payments being paid off with some of the Currences' money as well."  (ECF No. 118, p. 83).

Introduction of Exhibit B would also have shown the sham character of the "investment" in Primary Investments R & H, LLC.  For example, the "Capital Placement Program" document (ECF No. 131-1, p. 81) recites "historical net proceeds have averaged at least 125% per month," yet there is no disclosure as to where funds are actually invested.  Further, Exhibit B does not even contain a signed agreement by which Sovereign International would be paid for moneys invested on behalf of their clients.  SA Cessario testified he could find no evidence that Primary Investments was a legitimate investment, only "bank accounts in the name of what sounded like an investment, ... but there was - - I could find nothing behind it that there was any type of company or any type of legitimate business or organization behind it."  (ECF No. 118, p. 84).  Exhibit B would not have undermined such damning testimony.

Krug's Exhibit C (ECF No. 131-1, pp. 104-126) likewise fails to support his contention that he lacked any intent to defraud Mrs. Currence.  Exhibit C contains a Joint Venture Agreement between Sovereign International, LLC and Global Trust Services.  (ECF No. 131-1, pp. 105-108).  While the Joint Venture Agreement contains a provision that specifically mentions Mrs. Currence (¶ 7(B)), it is curiously dated June 2, 2006, approximately 10 months before Mrs. Currence wired her $500,000.00 to Sovereign International on March 30, 2007.  The Escrow Agreement (ECF No. 131-1, pp. 109-114) is dated February 23, 2007, and this also pre-dates Mrs. Currence's wire transfer

of funds to Sovereign International.  There is simply nothing in Exhibit C to support Krug's defense that he did not conspire to defraud Mrs. Currence, and it's introduction would have likely strengthened SA Cessario's testimony (ECF No. 118, p. 84) that he could find no evidence that Global Trust Services was a legitimate investment.

Steven Williams ("Mr. Williams"), an FBI forensic accountant, testified regarding the flow of money after Mrs. Currence's $500,000.00 wire transfer to Sovereign International.  Mr. Williams stated that shortly after Mrs. Currence's funds were received, multiple checks began to be cut out of Sovereign International's account to different individuals and corporations, including a $50,000.00 check cut to Krug International from which Krug International immediately cut two checks for $20,000.00 each to Elliott and Krug.  (ECF No. 118, p. 116).  Mr. Williams noted a $100,000.00 deposit received from Rose Duvall, from which a check was cut to Mrs. Currence on May 15, 2007 in the amount of $50,000.00, and numerous other checks were cut to various individuals and corporations.  (ECF No. 118, pp. 117-118).  Mr. Williams traced the flow of the $300,000.00 wire Sovereign International sent to Primary Investments, and he explained: the Primary Investments account had a balance of zero prior to the receipt of the $300,000.00 wire transfer; about a month later the money was wired to a company called Methwold International Finance; in March 2008 a wire came back from Methwold totaling $564,781.58; and, at that time Primary Investments sent a wire of $175,000.00 to White Buffalo[9].  (ECF No. 118, pp. 118-119).

Mr. Williams went on to explain that a check was then cut from the White Buffalo account

---

[9] An account owned by Elliott and Krug.  (ECF No. 118, pp. 96-97).

to Divine Resources[10] in the amount of $170,000.00, with another check of $3,250.00 being cut to Divine Resources in June 2008.  (ECF No. 118, p. 119).  From the $170,000.00 deposited into the Divine Resources account a check for $160,000.00 was issued to Sovereign International, and from the Sovereign International account multiple checks were cut to different individuals and corporations, including a wire transfer of $100,166.67 to Fortress Group USA, LLC, a check for $5,000.00 to Rose Duvall, a check for $10,000.00 to Brian Krug (Krug's son), and checks of $4,500.00 each to Elliott and Krug.  (ECF No. 118, pp. 120, 135).

According to Mr. Williams' forensic analysis, Mrs. Currence's $500,000.00 was gone in May 2007.  (ECF No. 118, p. 121).  He described the Defendants' activities reflected in the various bank accounts as evidence of a Ponzi scheme, where "you're receiving money in and then immediately paying out to other individuals as opposed to investing the money," and he saw no evidence of normal business expenses being paid out of the accounts.  (ECF No. 118, p. 123).

SA Cessario also described Krug's activities as engaging in a Ponzi scheme.  (ECF No. 118, p. 69).  When SA Cessario told Krug this, Krug replied that he did not think so because he was "still trying to get the funds back for Mrs. Currence."  (Id.).  The record shows that after Mrs. Currence put her money into Elliott and Krug's Ponzi scheme, Krug personally received $24,500.00 in checks, paid other personal expenses, distributed $10,000.00 to his son, and some of Mrs. Currence's money was used to "invest" in other Ponzi schemes.  Introduction of Krug's Exhibits A through C would not have detracted from that showing.  Moon's strategic decision not to introduce these exhibits cannot seriously be challenged.  *Rice*, 449 F.3d at 897.

---

[10] Another entity and bank account owned by Elliott and Krug.  (ECF No. 118, pp. 102-103).

Krug's other documents, Exhibits D through F, also fail to support his claim that he never conspired to defraud anyone.

Exhibit D shows a wire transfer on April 15, 2008 from Sovereign International to Fortress Group USA, LLC in the amount of $100,166.67. (ECF No. 131-1, p. 128). This is, of course, after Mrs. Currence has already suffered the loss of her money. As Mr. Williams testified, the funds sent to Fortress came from the moneys received back from Methwold and Primary Investments in March 2008 (ECF No. 118, p. 119); but, instead of returning funds to Mrs. Currence, Krug and Elliott sent the funds to Fortress. Exhibit D also includes a Participation Agreement (Private Placement Program) dated April 14, 2008 between Fortress Group USA, LLC and JH-1, LLC. (ECF No. 131-1, pp. 133-135). There is no disclosure in the Participation Agreement of what any funds are actually being invested in, and it does not even mention Sovereign International (or Mrs. Currence). Krug has not explained, nor has he shown, how Exhibit D would have undermined the Government's case against him.

Exhibit E reflects an investment of $1,665.00[11] in 1,500,00 uncirculated Iraqi Dinars in January 2011. (ECF No. 131-1, pp. 144-146). This comes years after Krug's criminal conduct resulted in Mrs. Currence's loss, and it reflects, at best, a feeble and foolish attempt to support his claim that he was still pursuing a recovery for her.

Exhibit F is similarly of no evidentiary value. It documents Krug and Elliott's participation in a rebate program through a company called Rebates International, Inc. A letter of May 31, 2002 shows termination in the rebate program and the return of certain rebate coupons. (ECF No. 131-1,

---

[11] Of which it appears that Divine Resources, LLC (Elliott and Krug) only paid $168.00, leaving a balance owed of $1,516.00. (ECF No. 131-1, p. 145).

p. 148).  The rebate coupons required redemption within 30 days from maturity, and all but two of them reached maturity well before the events at issue in this case.[12]  (ECF No. 131-1, pp. 149-152). There is nothing in the record to demonstrate a connection between these rebate coupons and Krug's activities with Mrs. Currence, nor any attempt by Krug to collect the proceeds of the rebate coupons.

After a careful review of the exhibits Krug claims his defense counsel should have introduced during trial, it is apparent to the undersigned that the exhibits would not have been helpful, and more probably hurtful, to the defense, and counsel's strategic decision not to use them at trial was well within the range of competence demanded of attorneys in criminal cases.  Since Krug has failed to show that his counsel's performance was deficient regarding this issue, there is no need to address the second *Strickland* prong of prejudice.  *Walker*, 324 F.3d at 1040.

### 3.  Failure to Call Witnesses

Krug next argues his counsel was ineffective "when he elected not to subpoena some twenty plus individuals connected to contracts and documents associated with Exhibits A through F, who could have testified on my behalf to the facts of the contracts and why we did not get paid."  (ECF No. 131-1, p. 19).  Krug fails to identify his purported witnesses or provide the substance of their testimony, and this is fatal to his claim.

Krug's § 2255 motion is insufficient to raise any issue as to whether trial counsel's failure to call witnesses was the result of deficient performance by counsel.  "Without knowing who [Krug] would have had counsel call as witnesses and what their testimony in his defense might have been, it is not possible for us - or anyone - to determine whether counsel's failure to identify (assuming

_____

[12] One rebate coupon for $29,400.00 matured on March 10, 2007 (20 days before Mrs. Currence wired her money to Sovereign International), and one for $14,890.69 matured on April 10, 2007 (11 days after Mrs. Currence's wire transfer).

trial counsel in fact failed to identify these witnesses) or to call such witnesses was reasonable at the time of trial." *Saunders v. United States*, 236 F.3d 950, 952 (8th Cir. 2001) (citing *Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir. 2000)).  "Further, the lack of specificity as to both the identity of the conjectural witnesses and the content of their testimony prevents us from assessing whether there was prejudice to [Krug's] defense as the result of counsel's performance, that is, whether there is a reasonable probability that the outcome would have been different but for counsel's alleged failings." *Saunders*, 236 F.3d at 952-953 (citing *McCauley-Bey v. Delo*, 97 F.3d 1104, 1106 (8th Cir. 1996), *cert. denied*, 520 U.S. 1178 (1997)).

As the Court in *Saunders* observed, there is no way to consider the credibility of "phantom witnesses," leaving the Court only to consider "the strength of the evidence actually presented by the prosecution" at Krug's trial, which was significant.  *Id*. at 953.

Krug also contends his counsel was ineffective for failing to call character witnesses.  (ECF No. 131-1, p. 20).  Attached to Krug's § 2255 motion is a series of affidavits and statements from Krug's large family and some friends.  (ECF No. 131-1, Exhibit I, pp. 27-72).  A review of these affidavits and statements shows that many of these folks believe Krug to be an honest, trustworthy, church-going man who put others first and who would never intentionally cheat or harm anyone. Another common theme is that Krug is a naïve and gullible man who got involved with the wrong people with the hope of providing for his family.  None of the statements reflects an understanding of the proof presented at trial against Krug – only opinions of his otherwise good character.

It is unclear from his allegations whether Krug faults his counsel for not calling these character witnesses at trial or at sentencing.  To the extent Krug asserts counsel should have called character witnesses during the trial, the opinions of Krug's character offer little to counter the

overwhelming evidence of Krug's involvement in the conspiracy to defraud Mrs. Currence of half a million dollars, the proof that he personally benefitted from the scheme, and his conduct in falsely reassuring Mrs. Currence and lulling her into taking no action to uncover the fraud sooner.  Krug also fails to demonstrate how the character witnesses' testimony would have had the effect of lowering his sentence.  Krug received a Guidelines sentence, and many of the positive aspects of the affidavits and statements were included in the PSR.  (ECF No. 99, ¶¶ 60-66).  The Court commented at sentencing "while I think that the activities that you engaged in as it relates to your victims in this case is wrong, bad, despicable, that doesn't mean that you're rotten to your core ... I do see good works and good things and certain good things about you when I look at the presentence report." (ECF No. 119, pp. 41-42).

Moreover, the decision not to call a witness is a "virtually unchallengeable" decision of trial strategy.  *See United States v. Davidson*, 122 F.3d 531, 538 (8th Cir. 1997), *cert. denied*, 522 U.S. 1034 (1997).

Accordingly, the undersigned finds neither deficient performance, nor a showing of prejudice, from counsel's decision not to call witnesses at trial or at sentencing.

### 4.  Failure to Move for a Severance

Krug next asserts that his counsel was ineffective by failing to seek a severance from his Co-Defendant, Charles Elliott.  (ECF No. 131-1, p. 20).  The claim has no merit.

"Judicial economy suggests that, when the right to a fair trial is not put at risk, persons charged in the same offense should be tried together, especially when proof against them is based upon the same evidence or acts." *United States v. Voss*, 787 F.2d 393, 401 (8th Cir. 1986) (internal citations omitted).  "Severance should be granted only upon a showing of real prejudice to an

-28-

individual's right to a fair trial; this requires more than a showing that a separate trial will enhance the chance of acquittal." *Id*. (internal citations omitted).  An accused must show that he would call the co-defendant at a separate trial, that the co-defendant would testify, and that the testimony would be exculpatory.  *Id*. (internal citations omitted).  Indicted co-conspirators should ordinarily be tried together, especially where proof of the conspiracy overlaps.  *United States v. Williams*, 97 F.3d 240, 243 (8th Cir. 1996) (internal citation omitted).

Krug alleges "Currence was Elliott's client and party to the [Joint Venture Agreement] and the only person having full knowledge of any conversations between Elliott and Currence before, during, and up to one and one-half years after the [Joint Venture Agreement] was over before Elliott stopped talking to Currence."  (ECF No. 131-1, p. 20).  He further alleges "I did not start talking to Currence until a short time later to let Currence know that I was still in contact with the people [Sovereign International] had contracted with, [...] and was still working to recover her funds."  (Id.). These allegations, however, ignore the uncontroverted evidence that: Sovereign International was an entity Elliott and Krug started and operated together for the purpose of investing other people's money; Krug also signed the Joint Venture Agreement with Mrs. Currence; shortly after Mrs. Currence's funds were received, a $50,000.00 check was cut from Sovereign International to Krug International, from which Krug then received a check for $20,000.00; on April 20, 2007 a deposit of $100,000.00 was made to the Sovereign International account from Rose Duvall, a client of Krug's; various other checks were cut from the Sovereign International account to pay Elliott's and Krug's personal expenses; $50,000.00 of Rose Duvall's money was used to pay the first installment of "interest" to Mrs. Currence; and, when $175,000.00 was received back from Primary Investments in March, 2008, the money was not returned to Mrs. Currence but, instead, was used for other

purposes, including additional distributions of $4,500.00 each to Elliott and Krug and a $10,000.00 distribution to Krug's son. While not every defendant joined must have participated in every offense charged, *United States v. Jones*, 880 F.2d 55, 62-63 (8th Cir. 1989), the evidence of record clearly shows Krug's involvement in the conspiracy to defraud Mrs. Currence from the very beginning. Moon would have been aware that these are the circumstances where joinder is not only permitted, but also preferred. It simply cannot be said that Moon's failure to seek a severance under such circumstances was constitutionally deficient.

Additionally, Krug has failed to demonstrate any prejudice resulting from not being severed. He has not alleged or shown that his defense was irreconcilable with that of Elliott's, nor that he was deprived of an appreciable chance that he would not have been convicted in a separate trial. Finally, he has not shown that the Court would likely have used its discretion to grant such a severance if one had been sought by his counsel.

Having shown neither deficient performance of counsel nor prejudice, Krug's severance claim is subject to summary dismissal.

### 5.  Failure to Object to Sentence

Krug also claims his right to effective assistance of counsel was violated when his counsel failed to argue that his right to be free from cruel and unusual punishment was violated when he was sentenced "as a fully culpable offender." (ECF No. 131-1, p. 20). He argues "the presence of factors reducing my culpability as shown in the records from trial and sentencing make clear ... that I was not fully aware of Elliott's fraudulent actions from the start." (Id.). The claim has no basis in fact.

First, as just discussed in the preceding section, the evidence at trial clearly established Krug's involvement in the conspiracy to defraud Mrs. Currence from the beginning. As such, Krug

was a "fully culpable offender."  His statements at sentencing[13] were not well received, and Judge

Brooks informed him that a jury of 12 people found him guilty, stating further "[s]o you've not done

yourself any favors standing up here and telling me you didn't do anything wrong."  (ECF No. 119,

pp. 39-40).

Second, Moon did argue for a downward variance at sentencing, and he requested that the

Court consider probation with home confinement except for employment.  (ECF No. 119, pp. 35-36).

In doing so, Moon referred to Elliott's sentencing and to the factors to be considered by the Court

in fashioning a fair and just sentence.  (Id., pp. 32-35).  Moon's argument for a downward variance

was then effectively undone by Krug's own statements during allocution which caused the Court to

consider, but decide against, an upward variance.  (Id., p. 41).  A sentence in the middle of the

Guidelines range was imposed.  (Id., pp. 43-44).

For these reasons, Krug's claim of ineffective assistance of counsel at sentencing should be

summarily dismissed.

### 6.  Failure to Argue Freedom to Contract

Finally, Krug asserts ineffective assistance of counsel because his counsel failed to argue that

he had a guaranteed right to contract under Article 1, Section 10, of the United States Constitution.

Krug claims his right to contract was impaired by the Government's prosecution in this case, and

when the Defendants were ordered to pay restitution, "whereas the [Joint Venture Agreement] ...

states the possibility of zero earnings."  (ECF No. 131-1, p. 21).  The claim is frivolous.

---

[13] That "I had never had any intentions of defrauding anybody out of anything" (ECF No.
119, p. 37); "I'm not a [thief] like this Court has made me out to be (Id., at p. 38); and, "I did not
commit fraud. I did not defraud the Currences out of their money. Others took their money."  (Id.,
pp. 38-39).

Krug makes much of the language in the Joint Venture Agreement that there is a possibility of zero earnings.  (See ECF No. 131-1, Exhibit A, ¶ 7(C), p. 76).  While the Joint Venture Agreement does state "[t]he client accepts the Company cannot in law make any representations, warranties or guarantees, that any of the services provided hereunder will result in a *profit*" (emphasis added), this provision only concerns earnings or profits and not the return of the client's principal investment at the end of the one-year term.  The Joint Venture Agreement also states that it "is subject to the laws of the United States of America."  (ECF No. 131-1, Exhibit A, ¶ 11(j), p. 78).

The contract clause relied on by Krug applies only to state, not federal, laws.  *Glosemeyer v. Missouri-Kansas-Texas R.R.*, 879 F.2d 316, 321 (8th Cir. 1989).  Krug was convicted of violating 18 U.S.C. §§ 1343 and 1349 which are federally enacted criminal statutes.

"Any claim that federal legislation unlawfully impairs existing contracts falls under the due process clause of the fifth amendment."  *See National Wildlife Federation v. ICC*, 850 F.2d 694, 702 n. 12 (D.C. Cir. 1988).  "The party asserting a Fifth Amendment due process violation must overcome a presumption of constitutionality and 'establish that the legislature acted in an arbitrary and irrational way.'"  *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe R.R.*, 470 U.S. 451, 472 (1985) (citing *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984)).  Here, Krug makes no claim that the statutes of conviction, 18 U.S.C. §§ 1343 and 1349, violate substantive due process because they are arbitrary, capricious and lacking in a rational basis.

Because any claim that Krug's right to contract was violated by his prosecution would have been inapplicable and frivolous, counsel cannot be said to have been ineffective for failing to raise the claim.  *Larson v. United States*,  905 F.2d 218, 219 (8th Cir. 1990).

### F.  No Evidentiary Hearing is Warranted

A petitioner is entitled to an evidentiary hearing on a habeas motion unless the motion and the files and records of the case conclusively show that he is entitled to no relief.  *United States v. Ledezma-Rodriguez*, 423 F.3d 830, 835-36 (8th Cir. 2005) (citing 28 U.S.C. § 2255).  No evidentiary hearing is required, "where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based."  *Watson v. United States*, 493 F.3d 960, 963 (8th Cir. 2007); *Anjulo-Lopez v. U.S.*  541 F.3d 814, 817 (8th Cir. 2008).  Those are the circumstances in this case.  Resolution of Krug's claims can be accomplished by reviewing the record and applicable law. A thorough review of Krug's § 2255 motion, the files and records of this case, and applicable law, shows that Krug is entitled to no relief.   Accordingly, the summary dismissal of Krug's § 2255 motion without an evidentiary hearing is recommended.

### G.  No Certificate of Appealability is Warranted

A Certificate of Appealability may issue under 28 U.S.C. § 2253 only if the applicant has made a substantial showing of the denial of a constitutional right.  A "substantial showing" is one demonstrating that reasonable jurists could debate whether the petition should have been resolved in a different manner or the issues presented deserved further proceedings even though the petitioner did not prevail on the merits in the court considering his case at present.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

In the present case, and for the reasons stated above, there is no substantial showing of the denial of a constitutional right, and a Certificate of Appealability should be denied.

### III.  Conclusion

For the reasons and upon the authorities discussed above, Krug's claims are not supported

by the record in this case. It is, therefore, recommended that Krug's motion filed under 28 U.S.C. § 2255 (ECF No. 131) be **DISMISSED with PREJUDICE** without an evidentiary hearing. Additionally, Krug's "Motion for Remand to Consider Motion Under Fed Rule Crim. P. 33(B)(1)" (ECF No. 131-1) and his "Notice of Motion and Motion to Declare the Grand Jury Unconstitutional and for an Order Dismissing the Indictment and, in the Alternative, for an Order Granting a Post-Indictment Preliminary Hearing - Federal" (ECF No. 135) should be **DISMISSED with PREJUDICE**. It is further recommended that a request for a Certificate of Appealability be denied.

**The parties have fourteen (14) days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely written objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of November 2017.

/s/ *Mark E. Ford*

HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

-34-